IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

TRAVIS S. THOMAS, SR.,           )
                                 )
    Plaintiff,                   )
                                 )
v.                               )      Case No. 3:21-cv-192-RAH
                                 )            [WO]
AUBURN UNIVERSITY,               )
                                 )
    Defendant.                   )

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This is an employment discrimination matter.  Plaintiff Travis S. Thomas, Sr. was terminated from the athletics department at Auburn University in early 2021 after, according to Auburn, Thomas failed to timely report a possible NCAA infraction regarding the last-minute change of a football player's semester grade. Thomas claims his termination was actually due to his race, and therefore filed this employment discrimination suit against Auburn.  Pending before the Court are summary judgment motions filed by both parties.  For good cause, Thomas's summary judgment motion is due to be denied and Auburn's motion is due to be granted.

### JURISDICTION AND VENUE

Original subject matter jurisdiction exists under 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

Summary judgment is appropriate where the materials in the record show there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) ("For factual issues to be considered genuine, they must have a real basis in the record." (citation omitted)).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  To prevent summary judgment, a factual dispute must be both material and genuine.  *Id.* at 247–48.  A fact is "material" if it has the potential of "affect[ing] the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).  And to raise a "genuine" dispute of material fact sufficient to preclude summary judgment, "the nonmoving party must point to enough evidence that 'a reasonable juror could return a verdict'" in his favor.  *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (per curiam) (citation omitted).  When both parties move for summary judgment, each motion must be evaluated on its own merits, with all reasonable inferences resolved against the party whose motion is under consideration.  *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

## BACKGROUND

Thomas was employed by the Student-Athlete Support Services (SASS) division of the Auburn Athletics Department from May 2017 until his termination in March 2021. Thomas initially served as an Academic Counselor I, working with student-athletes in "Olympic Sports"[1] (Doc. 86-4 at 6) under the supervision of Cathie Helmbold, at that time an Associate Athletics Director for SASS, (Doc. 86-3 at 5). Thomas's performance as an Academic Counselor I was impressive (Doc. 86-4 at 7), and his performance reviews reflected as much, (Doc. 99-2).

Around September 2017, Thomas began working with several football student-athletes under the supervision of Courtney Gage. Like Helmbold, Gage was an Associate Athletics Director for SASS. (Doc. 86-3 at 2, 5.) In the Spring of 2018, another institution began recruiting Thomas. Hoping to retain him, the SASS Team (including Helmbold's and Gage's supervisor, Senior Associate Athletics Director Dr. Kathryn Flynn (Doc. 86-2 at 4)), worked with Human Resources to promote Thomas, (id. at 8; Doc. 86-6 at 5). Beginning in October 2018, Thomas was placed in a new role created specifically for him: Director of Academic Support Services. (Doc. 86-4 at 8.) Thomas's new role came with a substantial change in pay and responsibilities, including supervision of student-athlete academic support services for the football team. (Doc. 86-2 at 8.) Despite the new position, Thomas still reported directly to Gage. (Doc. 86-3 at 5–6.)

### A. Thomas's New Position and His EEOC Charge

Within a year of his promotion, Thomas's wife was diagnosed with cancer and passed away in July 2019. (Doc. 86-4 at 8, 10.) According to his supervisors,

---

[1] Thomas worked with the men's and women's swimming and diving and women's volleyball teams.

Thomas's work performance subsequently declined.[2]  (Doc. 86-3 at 6; Doc. 86-2 at 9.)  Members of the SASS team tried to be understanding with Thomas after his wife's death, creating a meal delivery system for him from July 2019 to October 2019 (Doc. 86-4 at 9) and reducing his workload, including the frequency of meetings, (*id.* at 10).  But by December 2019, Flynn felt change was necessary because an unusually high number of football student-athletes were struggling academically (Doc. 86-2 at 11), student-athletes under Thomas's supervision were not receiving sufficient support regarding NCAA academic rules like "minor" declaration timelines (*id.* at 14–15), and members of the football coaching staff were expressing concern about Thomas's inaccurate maintenance of an Accountability Report that tracked football players' academic obligations, (*id.* at 22–23).  Hoping that a reduced workload would allow Thomas to focus on his core duties of "monitoring, tracking, communicating, and forecasting potential issues for his football student-athletes," Flynn removed Thomas's supervisory responsibilities.  (*Id.* at 17–18; Doc. 86-6 at 8; Doc. 86-4 at 13.)  This change did not impact his title or compensation (Doc. 86-6 at 8), but Thomas viewed it as racially discriminatory, (Doc. 87-2 at 13).

Six months later, in June 2020, Gage drafted a university-mandated annual performance review of Thomas.  Whereas Thomas's 2018–2019 Performance Review rated his performance as "Exceeds Expectation" (Doc. 99-2), his 2019–2020 review was much lower and was deemed "Marginal" by Gage due to perceived communication lapses and errors in his work, (Doc. 82-4 at 1–2).  Flynn, alongside Assistant Athletics Director for Human Resources, Karla Gacasen, reviewed and

---

[2] Thomas asserts that this is not true but does not provide much by way of support for this disagreement besides alleging racial discrimination as the cause of his poor performance evaluation.  Regardless, Thomas's work performance during this time is immaterial since it does not affect the outcome of the pending motions.

approved Gage's performance review.   (Doc. 86-2 at 25–26; Doc. 86-6 at 11.)
Thomas suffered no change in salary, compensation, other benefits of employment,
title, or job responsibilities due to this performance review.  (Doc. 86-6 at 12.)

In mid-June 2020, Thomas met with Athletics Human Resources generalist
Takisha Brown (now Takisha Rockette).  (Doc. 86-10 at 17.)  During their meeting,
Thomas reported that he was receiving conflicting instructions from Gage,
Helmbold, and Flynn.  (*Id.* at 18–19.)  He also told Rockette that he was being left
out of regular meetings between Gage, Helmbold, and Flynn.  In particular, he stated
that after his promotion, he had joined Gage, Helmbold, and Flynn in regular
meetings to discuss ongoing issues related to the football team (Doc. 86-2 at 9–10;
Doc. 86-3 at 7–8; Doc. 86-4 at 10–11; Doc. 87-1 at 19–20), but that he had noticed
that Gage, Helmbold, and Flynn would meet outside of these sittings as well.[3]
Thomas perceived these separate meetings as purposefully excluding him.  (Doc.
82-1 at 2–5.)  Thomas says that he told Rockette that the issues he faced were racial
(Doc. 87-2 at 6), although Rockette states that Thomas told her that he was being
treated in an unfair, but not racially discriminatory, manner, (Doc. 86-10 at 18).

Thomas had a similar conversation with Gacasen a few days after his
conversation with Rockette.  (Doc. 86-6 at 9–10.)  According to Gacasen, Thomas
was not making a claim of race discrimination.  Nevertheless, as per her standard
procedure, Gacasen recommended that Thomas contact Auburn's Affirmative
Action/Equal Employment Opportunity Office if he felt doing so could benefit him.
(*Id.*)  He never did.  (Doc. 87-1 at 28.)

Thomas retained legal counsel, and on June 9, 2020, he filed an Equal
Employment Opportunity Commission ("EEOC") charge against Auburn, asserting
race discrimination, sex discrimination, and a hostile work environment.  (Doc. 12-

---

[3] According to Gage, these additional meetings were informal and frequently occurred because
Gage, Helmbold, and Flynn had broader job responsibilities than Thomas.  (Doc. 86-3 at 7.)

3.)  On June 10, 2020, Athletics Director Allen Greene learned via email from Thomas's legal counsel that Thomas was filing an EEOC charge.  (Doc. 82-3.)  Greene did not tell Gage, Helmbold or Flynn about the EEOC charge, instead informing Auburn's Office of the General Counsel of it.  (Doc. 86-8 at 10.)  Gage, Helmbold and Flynn did not learn of the EEOC charge until a month later, on July 9, 2020.  (Doc. 86-2 at 27; Doc. 86-3 at 20–21; Doc. 86-4 at 20.)  In the meantime, after receiving his "Marginal" performance review on June 30, 2020, Thomas filed a supplemental charge of retaliation with the EEOC.  (Doc. 82-7.)

### B. Thomas's Termination

At that time, the NCAA maintained a "six-hour rule," which required that all student-athletes receive passing grades in at least six hours of academic credits in the fall semester in order to remain eligible to play in post-season games.  (Doc. 86-1 at 9.)  In December 2019, one of Thomas's assigned student-athletes—a football player—received a failing grade in a course, rendering the student ineligible under the six-hour rule to play in Auburn's January 1, 2020, post-season bowl game.

After receiving this failing grade, the student-athlete asked his professor if he could submit his final project late and receive credit for it.  The professor accepted the late submission and changed the final grade to a passing one.  (*Id.* at 10–11.)  According to Thomas, the professor actually changed the grade because of pressure from the administration.  (Doc. 41 at 19.)

But student-athlete grade changes for NCAA institutions were not so simple.  Auburn, the SEC, and the NCAA all required that grade changes comply with strict procedures when the change resulted in a previously ineligible student-athlete becoming eligible.  (Doc. 86-1 at 16.)  Because the Compliance Office in the Auburn Athletics Office was designed to assist the university in adhering to NCAA and SEC bylaws (*id.* at 3), the student-athlete's grade change caused Rich McGlynn, Auburn's then-Executive Athletics Director for Compliance, to request Matthew Ball,

Assistant Athletics Director of Compliance in Auburn's Compliance Office, to review the change, (*id.* at 11).  Satisfied that the change adhered to NCAA, SEC, and Auburn policy,[4] Ball approved the grade change.  (*Id.* at 11–12.)  Auburn's Registrar's Office then amended its list of bowl-eligible student-athletes so that it included the student-athlete (*id.* at 12), and the student subsequently played in the January 1, 2020 game.

Following the game, representatives from various Auburn departments, including Thomas, met on January 7, 2020, to discuss student-athletes' grades and to certify the students' eligibility.  When the time came to certify the student-athlete at issue, Thomas noted that the student-athlete had been academically ineligible for the bowl game under the six-hour rule.  In response, others at the meeting informed Thomas that the student-athlete's professor had changed the grade prior to the bowl game and that therefore the student-athlete had in fact been eligible.  (Doc. 86-4 at 16–17.)  Helmbold then forwarded to Thomas an automated email she had received when the grade had been changed.  (*Id.*)  Thomas had not previously received this email, even though Helmbold normally forwarded such emails to Thomas as a courtesy.[5]  (*Id.* at 15.)  Helmbold states that the reason she did not forward the email to Thomas as per her typical practice was because the grade change occurred over the Christmas holiday break.  (*Id.*)

Thomas was nevertheless concerned by the grade change because he had not been notified of the change prior to the meeting and because he felt he had not received the same information as his co-workers.  (Doc. 90-1 at 51–52.)  He also had

---

[4] Ball found that "The professor agreed to change the student-athlete's grade after understanding the student-athlete's family situation and reviewing the student-athlete's work. The department chair supported the decision, as did the Dean of the Graduate School and the Provost's Office." (Doc. 86-1 at 12.)

[5] There was no policy requiring that Thomas be sent emails regarding grade changes.  (Doc. 86-2 at 19; Doc. 86-3 at 13.)

continuing concerns that the grade change was improper and that the professor had made the change under pressure.  (Doc. 87-2 at 22–23; Doc. 90-26 at 19.)

One year later, Thomas still had concerns about the process behind the grade change.  So, in January 2021, through his attorney, Thomas officially reported this concern in writing to Auburn.  (Doc. 90-30.)  According to Thomas, he reported the violation more than a year after the incident because, after speaking with his legal counsel, he came to believe that his knowledge of the six-hour rule violation was related to the reason he had been treated with hostility at work.  (Doc. 90-1 at 52–53.)

Once reported, McGlynn began an investigation and met with Thomas about his concern.  (Doc. 90-26 at 12, 18, 20.)   McGlynn ultimately concluded that there was no wrongdoing on Auburn's part as it concerned the grade change.  But he also found a new issue: Thomas had violated NCAA and Auburn compliance rules by waiting more than a year to report a suspected NCAA, SEC, or Auburn rule violation.   (Doc. 86-6 at 15.)   McGlynn determined that Thomas's actions constituted a Group I offense under Auburn's Employee Conduct and Progressive Discipline Policy (*id.* at 21), and per the associated Group I disciplinary action set out by that policy, recommended that Thomas be terminated.

McGlynn then consulted with Gacasen (Doc. 90-26 at 30–31), who concurred with McGlynn's recommendation of termination, (Doc. 86-6 at 15).  When Gacasen consulted Linda Maxwell-Evans, Auburn's Executive Director of Campus Relations at Central HR, Maxwell-Evans also agreed with the recommendation.  (*Id.*)

On February 24, 2021, Gacasen advised Thomas that he was being placed on administrative leave effective immediately.  (*Id.*)  On March 1, 2021, Gacasen and McGlynn met with Thomas and informed him that he was being terminated pursuant to a compliance violation.  (*Id.*)  Gage, Helmbold, and Flynn were not consulted in

the decision to terminate Thomas.  (Doc. 86-2 at 32; Doc. 86-3 at 24; Doc. 86-4 at 20.)

In March of 2021, Thomas filed this lawsuit against Auburn.  As pleaded in Thomas's Third Amended Complaint, Count One is a race discrimination claim under 42 U.S.C. §2000e-2(a)(1), and Count Two is a wrongful retaliation claim under 42 U.S.C. § 2000e-3(a).  (Doc. 41.)

## DISCUSSION

Thomas and Auburn independently move for summary judgment on both of Thomas's claims. The Court first analyzes the race discrimination claim, then the retaliation claim.[6]

### A. Thomas's Race Discrimination Claim

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To survive a summary judgment motion, a plaintiff asserting a claim for unlawful discrimination in violation of Title VII must present sufficient facts to permit a jury to rule in his favor. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc) (*Lewis I*).  A plaintiff may satisfy this burden in three ways: (1) by presenting direct

---

[6] Auburn also raises a series of objections to Thomas's evidentiary submissions.  (Doc. 94.) Reaching the merits of these objections is unnecessary.  But the Court notes that Thomas's submission of a lengthy (20 page), self-serving declaration in lieu of citing his own deposition testimony, both in support of his own summary judgment motion and in opposition to Auburn's motion, evidences a tactic that the Court frowns upon and is greatly disfavored. *See Sears v. PHP of Alabama, Inc.*, Case No. 2:05CV304-ID, 2006 WL 932044, at *11 (M.D. Ala. Apr. 10, 2006) (noting "the general view of courts that deposition testimony is more reliable than affidavit testimony, given that the testimony of the deponent generally has been scrutinized through cross-examination.").

evidence of discriminatory intent; (2) by satisfying the *McDonnell Douglas* burden-shifting framework; or (3) by presenting "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1220, n.6 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Thomas does not present direct evidence of discrimination but does claim that he has satisfied both the *McDonnell Douglas* and convincing mosaic frameworks. The Court disagrees and finds that summary judgment is due to be granted in favor of Auburn when the evidence is viewed in a light favorable to Thomas, and therefore denied for Thomas.[7]

### 1. The *McDonnell Douglas* Framework

Under the *McDonnell Douglas* framework, Thomas must first establish a *prima facie* case of discrimination. *See Lewis I*, 918 F.3d at 1220, 1222. If he does so, a case of discrimination is presumed, and the burden shifts to Auburn to articulate a legitimate, nondiscriminatory reason for the employment action at issue. *See id.* at 1221. If rebutted, the burden then shifts back to Thomas to produce evidence sufficient to create a genuine issue of material fact that Auburn's articulated reasons are a pretext for unlawful discrimination. *Id.* As discussed below, Thomas is unable to make a *prima facie* case of race discrimination and therefore fails at the first step of the *McDonnell Douglas* framework. The Court consequently does not reach the other steps of *McDonnell Douglas*.

To establish a *prima facie* case of race-based treatment under *McDonnell Douglas*, a plaintiff generally must show that: (1) he is a member of a protected

---

[7] Auburn asserts in its reply brief that Thomas abandoned his § 1981 claims by not addressing them directly in his summary judgment response. Since Title VII and § 1981 claims have overlapping elements and provide for the same general relief, the Court concludes that Thomas has not forfeited his § 1981 claims. Instead, he has treated them the same, just as courts regularly do.

class, (2) he suffered an adverse employment action, (3) he was qualified to perform the duties of his job, and (4) the employer treated similarly-situated employees outside his protected class more favorably. *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001). In its summary judgment motion, Auburn only disputes Thomas's ability to satisfy prongs two (actionable adverse employment action) and four (proper comparator) of his *prima facie* case. (Doc. 85 at 63.)

       **a.    Only Thomas's termination is an actionable adverse employment action**

To show an adverse or tangible employment action, a plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006). The employer's action must satisfy a "threshold level of substantiality" and must impact the plaintiff's employment "in a real and demonstrable way." *Id.* "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Thomas raises several actions by Auburn that he claims rise to the level of an actionable adverse employment action. These actions include his termination, exclusion from team meetings, removal of his supervisory duties, an allegedly unjustified performance review, and certain disparaging and critical remarks made about him.[8] (Doc. 41 at 27–34.) Auburn concedes, as it should, that Thomas's termination is an actionable adverse employment action, but contests all others.

Thomas asserts, without citation to law or the record, that his exclusion from leadership team meetings, removal of certain duties and responsibilities, an allegedly

---

[8] In his discussion of Count One, Thomas placed primary emphasis on his termination.

unjustified performance review, and allegedly disparaging and critical remarks regarding him and his work rise to the level of actionable adverse employment actions. (Doc. 98 at 25.) Based on the evidence presented, and the general lack of development of this argument, Thomas has not sufficiently shown these actions to rise to the level of what are typically considered actionable adverse employment actions, especially since there is no assertion that Thomas's compensation, title, or position were fundamentally altered. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam) ("Tangible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone."); *Davis*, 245 F.3d at 1242 (employer criticism and unjustified negative evaluations); *Osman v. Alabama State Univ.*, No. 2:21-CV-525-RAH, 2023 WL 3061834 (M.D. Ala. Apr. 24, 2023) (finding that an "allegedly public reprimand… does not rise to the level of an adverse action because it did not result in discipline, a loss of pay or benefits, or any other tangible consequence.").

Perhaps more to the point, the party opposing summary judgment "must spell out his arguments squarely and distinctly, or else forever hold his peace," as the Court "may ignore arguments not adequately developed by [the] nonmovant." *Ratcliff v. Heavy Machines, Inc.*, Case No. CIV.A. 06-0861-WS-M, 2007 WL 1791646, at *3 (S.D. Ala. June 20, 2007) (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999)). "(T)he onus is upon the parties to formulate arguments." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc). Thomas, by quickly asserting these arguments in a few sentences without citations to case law, has failed to meet this threshold burden in articulating how these actions qualify as adverse employment actions that may be supported by the record.

Thomas is thus left with only one actionable adverse employment action for his *prima facie* case: his termination.  Accordingly, to survive summary judgment, Thomas must make a *prima facie* case of race discrimination as to his termination.

### b.  Thomas fails to identify appropriate comparators

Auburn also contests Thomas's ability to show proper comparator evidence. To meet his burden on this prima facie element, Thomas must show that "[his] proffered comparators were 'similarly situated in all material respects.'" *Lewis I*, 918 F.3d at 1218.  A similarly situated comparator will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy or guidelines; (3) have been working under the same supervisor; and (4) share the plaintiff's employment or disciplinary history. *Id.* at 1227–28.  In sum, "a plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (citation omitted).

Thomas argues that his three white, female colleagues (Gage, Helmbold, and Flynn) are proper comparators.  They are not for several reasons.  First, Gage, Helmbold, and Flynn were not Thomas's co-employees of similar title or position, and they all had different supervisors: Thomas reported to Gage, and Gage and Helmbold reported to Flynn.  (*E.g.*, *id.*; Doc. 86-2 at 4.)  Standing alone, these differences suggest that Gage, Helmbold, and Flynn are not appropriate comparators. *See Knox v. Roper Pump Co.*, 957 F.3d 1237 (11th Cir. 2020) (noting that "[w]hile not dispositive, the fact that different supervisors were involved [in incidents involving proffered comparators] is [a] meaningful distinction."); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.").

And second, Thomas does not attempt to show that Gage, Helmbold, and Flynn engaged in the same conduct that he did, or that they shared Thomas's

employment history. In fact, Thomas makes no effort to compare his employment history with that of any of his proposed comparators. And his choice to compare himself to other employees who did not allegedly engage in the same conduct "ignores the point of identifying a similarly situated comparator: finding someone who did the same thing but was treated differently so as to justifiably give rise to an inference of discrimination." *Oirya v. Auburn Univ.*, No. 3:17-CV-681-WC, 2019 WL 4876705, at *17 (M.D. Ala. Oct. 2, 2019), *aff'd*, 831 F. App'x 462 (11th Cir. 2020) (per curiam). *See also Giles v. Alabama Goodwill Indus.*, No. 2:20-CV-00723-JHE, 2022 WL 4449330, at *8 (N.D. Ala. Sept. 23, 2022) (noting that where the comparator's employment and disciplinary history lacks "meaningful overlap" with the plaintiff's, the plaintiff and comparator "are… easily distinguished" and the comparison is "not… appropriate"). To be proper comparators from a similar conduct standpoint, Thomas must show that Gage, Helmbold, and Flynn (1) believed the student-athlete's grade change was improper and a violation of NCAA, SEC or Auburn rules, (2) failed to timely report that belief, and (3) were not terminated. Instead, here, Gage, Helmbold, and Flynn all state that they believed the grade change to have been proper and that there was nothing to report. (Doc. 86-2 at 19–20; Doc. 86-3 at 25; Doc. 86-4 at 21.)

Rather than attempting to show how he and his proffered comparators are similarly situated, Thomas appears to argue, vaguely at best, that these three women were treated more favorably because they knew of the grade change, sanctioned it, suppressed it, and did not report it to others while he did report it and was terminated. Not only, as discussed above, does Thomas lack evidence that Gage, Helmbold or Flynn believed the grade change to have been improper, but there is also no evidence that, even if this was the case, any negative treatment he received, or favorable treatment they received, was due to race. As the Eleventh Circuit noted,

> Employers "are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" Therefore, even if a plaintiff's evidence supports an inference that the proffered reason is "pretext of *something*," summary judgment is appropriate if the plaintiff does not produce evidence that the reason was pretext of discrimination.

*McNeal v. Int'l Paper*, No. 21-12672, 2022 WL 5434274, at \*4 (11th Cir. Oct. 7, 2022) (per curiam) (citations omitted).  In other words, Auburn might have been attempting to hide compliance violations (and, to reiterate, Auburn has provided plenty of evidence that it was not, while Thomas has provided little that it was), but Thomas has adduced nothing to connect Auburn's actions to race discrimination besides the fact that Thomas is black and that Gage, Helmbold, and Flynn are white. The fact remains that Thomas officially reported a perceived rules violation over a year later than he was required to, and no evidence has been presented that the three proposed comparators had committed the same infraction and were treated more favorably.

Again, the Court is not responsible for developing the parties' arguments. And it will not attempt to develop Thomas's arguments for him, or to scour the record for evidence that supports an argument that he gives only lip-service. While he is thick on reciting facts outlining his years of employment at Auburn—17 pages to be exact—he is light on showing how each of those facts supports his *race discrimination* claim.  In short, Thomas has not identified a proper comparator, and thus has failed to establish a *prima facie* case under the *McDonnell Douglas* framework.  Similarly, and in considering the evidence in a much less deferential light for Thomas, Thomas's own summary judgment motion as to Count One, when considered under *McDonell Douglas,* is due to be denied.

### 2.  The Convincing Mosaic Framework

Despite failing under *McDonnell Douglas*, Thomas still can survive Auburn's summary judgment motion on Count One "if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Lockheed-Martin Corp.*, 644 F.3d at 1328 (footnote omitted) (citation omitted).  To succeed under the convincing mosaic framework, Thomas must "point[] to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (citation omitted).

Without much discussion, Thomas argues that he has satisfied the convincing mosaic analysis by presenting evidence that he was disparaged, excluded from leadership team meetings, removed of his supervisory duties, kept in the dark about the student grade change, and terminated for a claimed infraction that he did not commit.  This evidence, however, is insufficient to support a race discrimination claim under the convincing mosaic framework for two reasons: first, Thomas's claims are general and conclusory, and second, Thomas fails to tie any of these incidents to evidence of racial animus.  *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (stating that "conclusory allegations without specific supporting facts have no probative value."); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc) (stating that "[t]he role of this Court is to prevent unlawful [Title VII] practices, not to act as a super personnel department that second-guesses employers' business judgments.  Our sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged employment decision." (alterations in original) (citation omitted)).

Thomas's discussion of the alleged racial hostility he experienced at work serves as an example of his inability to show discriminatory intent.[9]  As he states,

> Flynn criticized Mr. Thomas by announcing, "the grades for football are the worst they've ever been," and calling Mr. Thomas "lazy, sloppy, and last minute" … amplifying an[] African American stereotype. The three white Team Members, Kathryn Flynn, Courtney Gage, and Cathie Helmbold each shook their heads in agreement with the deriding comments…, only to further publicly scorn him.

(Doc. 83 at 6.)  Thomas continues:

> The three white Team Members' use of sarcastic comments directed at Mr. Thomas were based upon his race resulting in a race-based cold and hostile work environment. Such sarcastic comments were rarely, if ever, directed towards any white employees. Although Kathryn Flynn, Courtney Gage, and Cathie Helmbold[] were too smart to use racial epithets, each criticism was based upon Mr. Thomas' ethnic style as a not-too-subtle putdown, laced with racial overtones.

(*Id.* at 8–9.)

Although the Court accepts for summary judgment purposes Thomas's testimony that Gage, Helmbold, and Flynn treated him poorly and unprofessionally, "inferences in favor of [an employee] can be based only on evidence—not on speculation." *Berry v. Crestwood Healthcare LP*, No. 22-11129, 2023 WL 7095309, at *7 (11th Cir. Oct. 27, 2023) (alteration in original) (quoting *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020)).  And Thomas offers no evidence that these statements or events occurred *because of* his race other than his own general and conclusory assertions.  In other words, Thomas fails to connect his alleged mistreatment to his race in a way that would allow a jury to infer discriminatory intent any more than it would allow a jury to infer any other reason for his termination.  And as the Eleventh Circuit has written, "we have never

---

[9] Much of Thomas's brief is devoted to a racially hostile work environment claim that no longer exists.

suggested that a plaintiff's generalized averment that her employer treated her differently than employees of a different race can, alone, create a 'convincing mosaic of circumstantial evidence' from which a jury could find intentional discrimination based on race." *Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013) (per curiam) (citation omitted). Indeed, "'Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the working place.' Unless something links the actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race." *Id.* (citation omitted).

As to the issue of systematically better treatment of similarly situated employees, no further discussion is necessary as the Court already has concluded that Thomas has failed to proffer proper comparators or similarly situated employees, and that even if he did, he has failed to present evidence showing systematically better treatment of them.

That leaves for consideration Thomas's assertion of pretext as it concerns the reason given for his termination—his failure to timely report a possible NCAA and SEC infraction.

> A plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer had failed to clearly articulate and follow its formal policies.

*Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1186 (11th Cir. 2019). Auburn asserts that it terminated Thomas for violating a core compliance rule when he failed to timely report his knowledge of a suspected rule violation. (Doc. 85 at 73.) The only concrete, non-conclusory response Thomas offers is that he could not report

this suspected rule violation because he would have reported it to the very people who were involved in the grade change and because those in attendance at the January 2020 certification meeting told him not to discuss the grade change any further.  (Doc. 83 at 20-22.)   In other words, Thomas argues that his termination pursuant to a compliance violation is pretext for his racially discriminatory termination because Auburn made it impossible for him to report the violation.

This does not constitute satisfactory evidence of pretext, as it does not cast sufficient doubt on Auburn's proffered nondiscriminatory reason to permit a reasonable factfinder to conclude that Auburn's proffered reason was not what actually motivated its conduct; it does not show that Auburn's articulated reason is false and that the false reason hid discrimination; and it does not establish that Auburn failed to clearly articulate and follow its formal policies.  But the evidence does show that Thomas reported the issue over a year later to individuals other than Gage, Helmbold, and Flynn.  And Thomas also failed to show why he could not have reported his concerns to these same individuals sooner if he believed Gage, Helmbold, and Flynn and others were involved in a grade-changing scandal or were attempting to sweep the grade-change under the rug.  Lastly, Thomas fails to present evidence showing how the actual decisionmakers involved in his termination (McGlynn, Gacasen, and Maxwell-Evans) had any racial animus toward him or were connected with the grade-changing issue in the first place.  Simply put, Thomas presents nothing that hints of racial animus.  Even if Thomas's termination was overly harsh and he was treated unfairly, this does not constitute sufficient evidence of pretext to support a convincing mosaic of discrimination as to his termination. Therefore, his discrimination claim under this theory fails as well.  Similarly, and in considering the evidence in a much less deferential light for Thomas, Thomas's own summary judgment motion as to Count One, when considered under the convincing mosaic framework, is due to be denied.

### B. Thomas's Retaliation Claim

Title VII makes it unlawful for employers to retaliate against employees who oppose unlawful discriminatory conduct or who have made a charge of unlawful discrimination under Title VII. *See* 42 U.S.C. § 2000e-3(a). In the absence of direct evidence of discrimination, which is the case here, the *McDonnell Douglas* framework is applied to retaliation claims. *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). "To make a *prima facie* case for a claim of retaliation under Title VII, a plaintiff must first show (1) that 'she engaged in statutorily protected activity,' (2) that 'she suffered an adverse action,' and (3) 'that the adverse action was causally related to the protected activity.'" *Gogel*, 967 F.3d at 1134 (citations omitted). Importantly, "[t]o establish the necessary causation [under prong three], a plaintiff must demonstrate that 'her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Id.* at 1135 (citation omitted). In other words, "a plaintiff must prove that had she not complained, she would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate a legitimate reason for the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). If the defendant does so, the plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the defendant's proffered reasons is pretextual. *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

The parties agree that Thomas's EEOC charge constitutes statutorily protected activity. *See generally Gogel*, 967 F.3d at 1135. The Court will also assume without deciding that Thomas's complaints to human resources about racial discrimination constitute statutorily protected activity.

It is also undisputed that Thomas's termination constitutes an actionable adverse employment action. But in his brief, Thomas also vaguely argues that his

20

June 2020 performance evaluation and the alleged pressure to resign from his position qualify as actionable adverse employment actions.   Other than his termination, however, he makes no real attempt to argue why these other actions qualify.   And cases from this Circuit indicate that, without more, such actions generally are not actionable because, on a retaliation claim, a materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."   *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67; *Monaghan*, 955 F.3d at 861.   There must be a material impact from the adverse action for it to qualify for purposes of Title VII retaliation, and evaluations and generalized internal pressures, on their own, do not rise to that level.   *See Cain v. Geren*, 261 F. App'x 215, 217 (11th Cir. 2008) (per curiam) (noting that "[a] lower score on [a] performance evaluation, by itself, is not actionable under Title VII unless [the employee] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities") (alterations in original) (quoting *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53); *McKitt v. Ala. Alcoholic Beverage Control Bd.*, No. 2:12-CV-673-WHA, 2013 WL 5406804, at *17 (M.D. Ala. Sept. 25, 2013), *aff'd*, 571 F. App'x 867 (11th Cir. 2014) (finding that "increased scrutiny, new office rules, or lateral transfer" did not "constitute[ ] a materially adverse employment action for a retaliation claim" where the actions did not result in "some tangible harm").   Given these cases and Thomas's lack of development of his argument, the Court concludes that Thomas's termination is the sole actionable adverse employment action he suffered for purposes of his Title VII retaliation claim.

Auburn only contests the causation element of Thomas's *prima facie* case under *McDonnell Douglas*, and indeed Thomas's retaliation claim ultimately fails on that ground.   Thomas not only does not connect his termination to his EEOC

charges, he also does not connect his termination to his complaints to HR. As the Eleventh Circuit has written, "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1120 (11th Cir. 2004). As to the EEOC charge, Auburn is correct that, without more, a multi-month period between the filing of the two EEOC charges in June and July of 2020 and Thomas's termination over 8 months later in early March of 2021 is sufficient to sever causation: a "three-to-four-month delay is too long, while a one-month gap may satisfy the test." *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 639-40 (11th Cir. 2021) (per curiam) (citations omitted)*; see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (stating that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (citation omitted)); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (finding that, without more, a three-month delay between a statutorily protected activity and termination was not "very close," and thus that the plaintiff had failed to establish a causal connection). And Thomas confronts precisely the same problem as to his HR complaints: he provides nothing connecting his March 2021 termination to the complaints of discrimination he alleges that he made to HR in late-2019 and mid-2020.[10]

Because Thomas cannot show a causal connection between a statutorily protected activity and his termination, he fails to make out a *prima facie* case of

---

[10] Since the problem here is one of causation, it is irrelevant that, as Thomas asserts, Monique Holland has continued the "pattern or policy of discrimination" displayed here during her subsequent employment at another university. (Doc. 110 at 3.)

retaliation.  Summary judgment is therefore due to be granted to Auburn on Count Two for retaliation, and against Thomas on his own summary judgment motion.

## CONCLUSION

Accordingly, it is hereby ORDERED as follows:

(1)     Plaintiff Thomas S. Travis, Sr.'s Motion to Consider Additional Supporting Evidence (Doc. 110) is **GRANTED**, and the evidence is considered as filed;

(2)     Plaintiff Thomas S. Travis, Sr.'s Motion for Summary Judgment (Doc. 82) is **DENIED**;

(3)     Defendant Auburn University's Motion for Summary Judgment (Doc. 84) is **GRANTED**;

(4)     A separate judgment will issue.

DONE, on this the 1st day of November, 2023.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE